**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In Re:

Geoffrey Kubik                                    Case No.  19-30353
                                                  Chapter 7
_____Debtor,_____/                   Hon. Joel D. Applebaum

Aaron Trumley, an individual,
Tron IT Consulting, Inc., a Michigan
Corporation,
            Plaintiffs,
v.
                                                  Adv. Proc. No. 19-3050
Geoffrey Kubik
_____Defendant,_____/

## OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Aaron Trumley and Tron IT Consulting, Inc. filed an adversary complaint seeking the determination that Defendant Geoffrey Kubik's debt to Plaintiffs is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) (false pretenses, false representation and fraud), §523(a)(4) (fraud of a fiduciary), and § 523(a)(6) (willful and malicious injury).  Plaintiffs also seek the denial of Defendant's general discharge under § 727(a)(3) (failure to maintain records) and §727(a)(4)(A) (false oath or account).  For the reasons set forth in this Opinion, Defendant's motion for summary judgment is GRANTED.

I.

### FACTUAL BACKGROUND

Plaintiff Aaron Trumley is a Jeep enthusiast and the sole owner of Plaintiff Tron IT Consulting, Inc., a small manufacturing company.

Defendant Geoffrey Kubik is a mechanic who began doing business as Freedom Fabworks in 2015. Freedom Fabworks was in the business of providing repair and modification services for vehicles, especially those with off-road capabilities, primarily Jeeps. Kubik organized Freedom Fabworks as a Michigan limited liability company on December 6, 2016, with Kubik acting as its registered agent and manager.

Although Tron and Freedom Fabworks are separate legal entities, the parties do not appear to make any distinctions between Trumley and Tron ("Plaintiffs") on the one hand, and Kubik ("Defendant") and Freedom Fabworks on the other. For this reason, this Court will only refer to Trumley and Kubik, unless the reference to the corporate entity is relevant.

In 2015, Trumley discovered Freedom Fabworks through its online presence on Instagram and Facebook. [July 9, 2020 Kubik Deposition Transcript, attached to Plaintiff's Response to Motion for Summary Judgment as Exhibit A, at 7.] The Facebook and Instagram accounts promoted Kubik as a "great mechanic." *Id*. at 24. Freedom Fabworks also had a website, [www.freedomfabworks.com](www.freedomfabworks.com), but it was not regularly maintained. The contact for the Freedom Fabworks' website was Kubik. [July 9, 2020 Kubik Transcript, p. 17.] The website indicated that Freedom Fabworks had a "large base of loyal customers" and "the ability to satisfy the needs of our customers no matter the caliber of vehicle, whether it's a daily driver of purpose-built for off-road use. At Freedom Fabworks, we are dedicated to providing the best service and craftsmanship to our customers." [Trumley Declaration, ¶ 2 and Exhibit 1 attached thereto.] Trumley consulted his brother, who owns a licensed repair facility in Florida that specializes in Jeep repairs and modifications, about Freedom Fabwork's online materials. Trumley's brother told him that it appeared from Kubik's online presence that he was qualified and performed quality work. [Trumley Declaration, ¶¶ 3 – 4.] At that point, Trumley began talking to Kubik. Trumley claims

that Kubik represented that he was qualified mechanic who ran a successful repair facility, that he was experienced, and that he was qualified to undertake the repairs and modifications desired by Trumley. [Trumley Declaration, ¶ 5].

Trumley first hired Kubik sometime in 2016 to install shocks and coil springs on one of his Jeeps, a licensed and MDOT road-legal Jeep TJ. Trumley hired Kubik a second time to install a roll cage along with some other modifications [Trumley Deposition, p. 11]. The third time he hired him, Trumley had Kubik replace the radiator and water pump, and perform other miscellaneous work [Trumley Deposition, p. 10-13]. Trumley testified that he made various payments to Kubik and estimates that, by the third time Kubik had worked on his Jeep TJ, Trumley had paid Kubik approximately $15,000.00 [Trumley Deposition, p. 19]. Trumley and Kubik had no written contracts regarding the scope of the work or the cost for each item and much of their communication was by Facebook message. [Trumley Deposition, p. 13-14, 63-64].

Trumley and Kubik then discussed Kubik providing Trumley's Jeep with an "LS Conversion", in which the Jeep TJ's motor would be replaced with a higher performance engine. Trumley asserts that Kubik represented that he had experience in engine swaps and could handle the job. [Trumley Declaration, ¶¶ 8 – 9.] This modification ended up turning into a complete rebuild of the Jeep: the axles were replaced, the transmission was replaced, the suspension system was replaced, and the electrical/computer systems were replaced. [Trumley Declaration, ¶ 11.] Kubik had possession of the Jeep TJ for almost two years for these modifications. Sometime during this period, Trumley delivered a second vehicle, a licensed and MDOT road-legal Jeep JK, to Kubik for repairs and modifications.

According to Trumley, sometime in 2017, Trumley and Kubik agreed to a business venture whereby Trumley would manufacture Jeep tailgates bearing the Freedom Fabworks logo with no

up-front cost to Kubik. Kubik would then sell the parts, reimburse Trumley for his costs, and the two would split the remaining profits. [Trumley Declaration, ¶¶ 15 - 16.] Later, Kubik asked Trumley to also produce instrument clusters bearing Freedom Fabwork's logo under this same arrangement. [Trumley Declaration, ¶¶ 15 - 16.] This agreement was never committed to writing.

In reliance on this agreement, Trumley produced tailgates and instrument clusters at a cost to Trumley of approximately $30,000, and these were delivered to Kubik for sale. [Trumley Declaration, ¶ 17]. Despite their agreement to split any profits, Kubik sold at least one tailgate, but never remitted any money to Trumley. [Trumley Declaration, ¶ 18.]

In June 2018, Trumley informed Kubik that all repairs and modifications to the Jeep TJ needed to be complete for a family off-roading trip in the fall of 2018. [Trumley Declaration, ¶ 22.] The vehicle needed new wiring, which Kubik admittedly was not qualified to complete, so Trumley took the Jeep to Steve Dexter, a licensed mechanic, for the wiring. [Trumley Deposition, p. 60.] During this time, Dexter, Trumley and Kubik created a punch-list of items Kubik needed to complete before the new engine could be tuned by Dexter. [July 9, 2020 Kubik Transcript, pp. 40 – 41; Trumley Declaration, ¶ 23.] Dexter then completed the wiring and the vehicle was returned to Kubik for completion of the punch-list items. Kubik indicated that he had completed all items and that the vehicle was ready to be taken back to Dexter to be tuned. [Trumley Declaration, ¶ 25.] Kubik requested that the Jeep be returned to him after it was tuned for a "once over." [Trumley Declaration, ¶ 26.]

According to Trumley, when the Jeep was taken back to Dexter, he learned that: (i) items Kubik represented as having been completed had not been performed; and (ii) parts Trumley had already paid for were not installed. [Trumley Declaration, ¶ 27.] Trumley contacted Kubik about the missing parts and Kubik could not explain where parts, bought and paid for by Trumley, had

gone. Kubik suggested that maybe those parts were never installed and were at his shop. [Trumley Declaration, ¶ 28.] However, he never found and/or returned those parts to Trumley. *Id.*

By this time, Trumley had lost confidence in Kubik, so he did not return the Jeep TJ to Kubik for the "once over." Instead, Trumley hired Dexter and Alpha Fab in Canton, Michigan, to complete the work on the Jeep TJ. Dexter discovered the following problems with the Jeep TJ: failure to install new gaskets and sensors; failure to properly tighten engine bolts; and failure to install the transfer case plug. [Trumley Declaration, ¶ 29.] Trumley had these issues remediated by third-party mechanics. Afterwards, Trumley spoke with Kubik, who gave no indication that, with the third-party repairs, and despite the incomplete nature of certain cosmetic modifications, the Jeep TJ would be unsafe to drive. [Trumley Declaration, ¶¶ 29 – 32.] Rather, Kubik wished Trumley well and told him to have a good time on vacation. [Trumley Declaration, ¶ 32.]

Trumley then took his family on a vacation to the Mojave Desert to off-road with the Jeep TJ. The Jeep TJ broke down in the desert, allegedly endangering the lives of Trumley and his family. [Trumley Declaration, ¶ 33.] According to Trumley, the break down was a result of a catastrophic failure of the axle, the motor, and the suspension system. *Id.*

Upon returning from the Mojave Desert, Trumley contacted Kubik to secure the return of his property which, according to Trumley, included a Jeep JK that Kubik had for repairs and modification, all parts removed from the Jeep TJ, and all parts and equipment supplied by Trumley for use on his Jeeps or as part of their business venture. [Trumley Declaration, ¶ 34.] Trumley also contacted law enforcement and, with their assistance, removed Trumley's property from Kubik's premises. *Id.*

Upon securing the Jeep JK and other property from Kubik, Trumley took an inventory and discovered that Kubik had failed to return all of Trumley's property. [Trumley Declaration, ¶ 36.]

Kubik testified that on one occasion, he just kept the money Trumley gave him to purchase a part. [July 9, 2020 Kubik Transcript, pp. 45 – 47.] Further, Kubik has axles belonging to Trumley. Kubik states that he is waiting for Trumley to come pick them up. [July 9, 2020 Kubik Transcript, p. p. 33.]

It was at this time, and after all monies had been paid to Kubik, that Trumley contacted the Michigan Secretary of State and discovered that Freedom Fabworks was not registered as required under the Michigan Motor Vehicle Service and Repair Act. MCL 257.1301 *et. seq.* Further, Trumley discovered that Kubik was not a licensed mechanic at the time he performed work on Trumley's Jeeps. [Trumley Declaration, ¶ 38]. All of Kubik's licenses (Front End and Steering; Manual Transmission and Axles; Brakes and Braking Systems) had expired in March 2015, before Trumley began working with Kubik. [Kubik Response, Exhibit B.] Further, Kubik was not licensed to perform engine swap work and he did not hold a license for electrical systems. [July 9, 2020 Kubik Transcript, pp. 19 – 20.]

On December 27, 2018, Trumley filed a state court case against Geoffrey and Amanda Kubik, and Freedom Fabworks, LLC, in the Genesee County Circuit Court alleging, *inter alia*, conversion, fraud and equitable accounting.

On February 19, 2019, Geoffrey Kubik filed a chapter 7 bankruptcy case. Freedom Fabworks did not file for bankruptcy but is no longer operating.

On May 28, 2019, Trumley filed the present five count adversary complaint seeking the determination that Kubik's debt to Trumley is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A) (false pretenses, false representation and fraud), §523(a)(4) (fraud of a fiduciary), §523(a)(6) (willful and malicious injury), and seeking the denial of Kubik's general discharge under § 727(a)(3) (failure to maintain records) and § 727(a)(4)(A) (false oath or account).

The parties conducted discovery in this case, including depositions of Trumley and Kubik. Kubik has also served at least two sets of interrogatories on Trumley. However, Trumley only responded to one set, and that set was unsigned.

On August 12, 2019, this Court entered an order requiring the parties to go to mediation. The parties were ordered to select a mediator by October 1, 2019 and to complete mediation by March 9, 2020. The parties were also ordered to report the results to the Court by March 13, 2020. No mediation report was ever filed with the Court.

On April 30, 2020, Kubik filed this Motion for Summary Judgment. On July 29, 2020, after several extensions of the response date, Trumley filed his Response to Motion for Summary Judgment and filed his corrected Response on July 30, 2020.

II.

STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. 317, 323. Once the movant meets this burden, the non-movant must come

7

forward with specific facts showing that there is a genuine issue for trial. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). To demonstrate a genuine issue of material fact in dispute, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The Court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

III.

## JURISDICTION

Bankruptcy courts have jurisdiction over all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11. 28 U.S.C. §§ 1334 and 157. Core proceedings include objections to discharge. *Id.* § 157(b)(2)(J). As this is a proceeding regarding a determination of the dischargeability of debts and an objection to the general discharge, this is a core proceeding under 28 U.S.C. § 157(b). Thus, this Court has jurisdiction over this matter.

IV.

## ANALYSIS

### A. Standards for the Non-Dischargeability of a Debt under 11 U.S.C. § 523(a)

Relief under the Bankruptcy Code was designed to provide "honest but unfortunate debtors" with a fresh start by granting a discharge of their debts. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). Notwithstanding the general availability of the discharge, § 523 of the Bankruptcy Code specifically enumerates certain debts that are not discharged in bankruptcy for various public policy reasons. Some debts are excluded from discharge because they involve intentional wrongdoing. Other debts are excepted from discharge based on the nature of the obligation, without regard to any culpability of the debtor. These latter non-dischargeable debts

8

include, but are not limited to, support obligations, student loan obligations, and many tax claims. The Bankruptcy Code recognizes that society's interest in excepting those debts from discharge outweighs a debtor's need for a fresh economic start. Exceptions to discharge are to be strictly construed against the creditor and are to be strictly construed in favor of the debtor. *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348, 359 (Bankr. E.D. Mich. 2012).

1. **Non-Dischargeability of Debt Under 11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud. . . " The purpose of 11 U.S.C. § 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1451 (6th Cir. 1994). To prevail on a claim under this section, a plaintiff must show that:

> (1) [T]he debtor obtained money through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir. 1998). *See also*, *Digital Commerce Ltd. v. Sullivan (In re Sullivan)*, 305 B.R. 809, 823 (W.D. Mich. 2004). A "false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. A false pretense has been defined to include a "mute charade," where the debtor's conduct is designed to convey an impression without oral representation. A "false representation," on the other hand, is an expressed misrepresentation. *Schafer v. Rapp (In re Rapp)*, 375 B.R. 421, 433 (2007) *citing James v. McCoy (In re McCoy)*, 114 B.R. 489, 498 (Bankr. S.D. Ohio 1990) (citations omitted). With respect to § 523(a)(2), the creditor must prove each element by a preponderance of the evidence. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

9

In this case, Trumley's Complaint alleges that Defendant Kubik committed fraud because "G. Kubik and Fabworks, individually and jointly, made representations to Trumley that they would repair and/or modify the Jeep TJ and Jeep JK by licensed mechanics, accordance [sic] with Michigan law and industry standards." (Complaint, ¶ 64).

Kubik moves for summary judgment on the grounds that Trumley has not demonstrated that his reliance on the misrepresentation was justifiable. Justifiable reliance is judged on the circumstances of a particular transaction and requires a creditor to use reasonable care to safeguard his investment. In order to establish justifiable reliance:

> [A] person is "required to use his senses and cannot recover if he blindly relied upon a misrepresentation the falsity of which would be patent to him if he utilized his opportunity to make a cursory examination or investigation."

*Willens v. Bones (In re Bones)*, 395 B.R. 407, 431-32 (Bankr. E.D. Mich. 2011), quoting *Field v. Mans*, 516 U.S. 59, 70-71 (1995); *Jennings v. Bodrick (In re Bodrick)*, 509 B.R. 843, 855 (Bankr. S.D. Ohio 2014); *Norwest Plumbing and Heating v. Constantino (In re Constantino)*, 72 B.R. 231 (Bankr. N.D. Ohio 1987) (the degree of care necessary to show reliance is that degree of care which would be exercised in an average business transaction by parties under similar circumstances); *Van Wert Nat'l Bank v. Druckemiller (In re Druckemiller)*, 177 B.R. 859, 861 (Bankr. N.D. Ohio 1994) (plaintiff relying on defendant's honesty does not satisfy the reasonable reliance standard under § 523(a)(2)(A)).

This Court finds that Trumley did not rely on any representations as to Kubik's status as a licensed mechanic when he hired Kubik to work on his Jeep. Trumley's deposition testimony, and Kubik's affidavit, confirm that any inquiries by Trumley regarding Kubik's licensing status were made only after their business relationship had ended. Fraud requires reliance and Trumley cannot base a claim of reliance on information received at the end of a relationship, after funds were paid.

Accordingly, this Court finds that there are no genuine issue of material fact regarding whether Trumley relied on any misrepresentations concerning Kubik's status as a licensed mechanic. Trumley did not rely on such status and, therefore, Trumley's claim under 11 U.S.C. section 523(a)(2)(A) is dismissed.

At oral argument, Trumley argued that Kubik committed fraud by holding himself out as "a licensed mechanic in a licensed facility . . . . He opened his business to the public, he had a shop separate from his home that he operated for at least one or two years with a sign out front, open for business for all." Trumley further argued that Kubik knew that the few licenses he did have were soon expiring, and for the first time argued that Kubik "suggested" to Trumley that he perform a LS Conversion on the Jeep TJ, and that he assured Trumley that he had completed at least two LS conversions in the past.[1] Even assuming that all of these allegations are true, section 523(a)(2)(A) requires a finding of reliance on the fraud – in this instance the fraud being the representation that Kubik could perform a LS Conversion because he had completed them in the past. The record does not support a finding that Kubik made such statements or, more importantly, that Trumley relied on Kubik's alleged statements when agreeing to the LS Conversion. The relationship between Trumley and Kubik started in 2016, when Trumley hired Kubik to put shocks and coil springs on his Jeep TJ. Trumley then hired Kubik again to install a roll cage. Trumley then had Kubik replace the radiator and water pump and perform miscellaneous other work on the Jeep TJ. All of the prior repair work was completed to Trumley's satisfaction or Trumley would not have kept hiring Kubik to perform additional work, including hiring Kubik to perform the "LS

---

[1] This argument was not raised in Trumley's Complaint. Rather, Trumley's Complaint alleged fraud on the grounds that Kubik was not licensed and did not perform the modification up to industry standards. (Complaint, ¶64). It was in Trumley's response brief where Trumley first raised fraud based on alleged misrepresentations made by Kubik to Trumley regarding his ability to perform the LS Conversion and his past experiences doing them.

Conversion."  For these reasons, the Court finds that Kubik did not fraudulently induce Trumley to enter into an agreement for Kubik to perform the "LS Conversion".  Rather, Trumley entered into the agreement with Kubik to perform the "LS Conversion" based on Trumley's prior experience and extended relationship with Kubik.

In addition, even had Kubik represented that he could perform an LS Conversion,[2] nothing in the record evidences that Kubik intended to deceive Trumley.  The record suggests that Trumley and Kubik both enjoyed modifying Jeeps, that Kubik did a wide-range of work modifying Jeeps, and that Trumley and Kubik had a friendly relationship surrounding the Jeep modifications. Nothing in the record, other than argument, suggests that Kubik intentionally mislead Trumley as to his skill set or that Kubik did not believe he could perform the LS Conversion when he started the job.  A mere breach of contract or a misguided belief that a person can perform or complete a job, without more, does not rise to the level of fraud.  *Mid-Am Gunite, Inc v Sauereisen, Inc*, No. 06-11204, 2006 WL 1374505, at \*2 (E.D. Mich. May 19, 2006) ("The fraud in the inducement exception is limited to claims of misrepresentation regarding matters other than the quality or character of the goods sold."); *Miller v. Liatos (In re Liatos)*, 2012 WL 3260350 (Bankr. E.D. Va. August 8, 2012) (although the issue of licensure was not raised, an auto mechanic who asserted that he had over 30 years of experience -- which he did -- is not an implied warranty that his work will be good.)  Therefore, because the Court finds that Trumley did not rely on Kubik's alleged misrepresentations and Kubik did not intentionally deceive Trumley, Kubik's motion for summary judgment is granted on this count.

---

[2] As previously noted, this claim was first raised in Trumley's response brief and was not alleged in his Complaint.

12

## 2.  11 U.S.C. § 523(a)(4):  Nondischargeability Based on Breach of Fiduciary Duty or Embezzlement

Under 11 U.S.C. § 523(a)(4), a debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  The Sixth Circuit has defined the term "fiduciary capacity" as used in § 523(a)(4) narrowly, holding that the term applies only to express or technical trust relationships, where a specific property is placed in the hand of the debtor as trustee.  *R.E. America v. Garver (In re Garver),* 116 F.3d 176, 179 (6th Cir. 1997). In other words, the term "fiduciary" as used in § 523(a)(4) does not apply to implied trusts. *Garver,* 116 F.3d at 178-79. The question of who is a fiduciary for purposes of § 523(a)(4) of the Bankruptcy Code is one of federal law.  *Tweedie v. Hermoyian (In re Hermoyian)*, 466 B.R. 348 (Bankr. E.D. Mich. 2012) citing *Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 251 n. 2 (6th Cir.1982) ("State law is merely a factor in the equation used to determine whether the fiduciary capacity requirement is satisfied as a matter of federal law, using federal standards."). There are four requirements for establishing the existence of an express or technical trust: (i) an intent to create a trust; (ii) a trustee; (iii) a trust res; and (iv) a definite beneficiary. *Patel v. Shamrock Floorcovering Services, Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009).

"[T]he defalcation provision of § 523(a)(4) is limited to only those situations involving an express or technical trust relationship. Defalcation then occurs through the misappropriation or failure to properly account for those trust funds."  *Garver*, 116 F.3d at 180 (citations omitted). Defalcation encompasses "embezzlement, the 'misappropriation of trust funds held in any fiduciary capacity,' and the 'failure to properly account for such funds.'" *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency)*, 760 F.2d 121, 125 (6th Cir. 1985) (citations omitted).

Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982) (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicated fraud." *Davis v. Kindrick (In re Kindrick)*, 213 B.R. 504, 508 (Bankr. N.D. Ohio 1997). Embezzlement is commonly understood to occur when a person has legitimate access to funds and then uses those funds for an illegitimate purpose; for example, a bank teller who siphons off money from the bank till, or a school treasurer who uses school funds to pay for a vacation trip. Under § 523(a)(4), the creditor must prove each element by a preponderance of the evidence. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

In this case, Trumley alleges that Kubik owed a fiduciary duty to Trumley by virtue of their alleged joint venture. In his Complaint, Trumley alleges that: (1) Kubik used parts paid for and supplied by Trumley on personal and third-party projects for which they were not authorized or intended; (2) Kubik failed to compensate Trumley for products sold in accordance with the business agreement; and (3) Kubik deposited funds received on the sale of products into personal, non-business accounts and utilized those funds for personal use.[3] (Complaint, ¶ 72). Trumley cites

---

[3] Specifically, Trumley's Complaint states:

> 72.    G. Kubik owed a fiduciary duty to Trumley and/or Tron with respect to the Joint Venture. G. Kubik breached that fiduciary duty and converted such property to his own use. Such acts of conversion include, but are not necessarily limited to:
>
> > a.    Utilizing parts paid-for and supplied by Tron on personal and third-party projects for which they were not authorized or intended;

two Michigan cases in support of a finding that Kubik owed Trumley a fiduciary duty with respect to their alleged joint venture. *Schmude Oil Co. v. Omar Operating Co.*, 458 N.W.2d 659, 664 (Mich. Ct. App. 1990); *Latimer v. Piper*, 246 N.W. 65, 68 (Mich. 1933). These cases hold that parties to joint venture agreements may owe each other a fiduciary duty. Both of these cases, however, concerned findings based on equity and not on a determination that there existed an express or technical trust. Fraud under §523(a)(4), as previously noted, requires an express or technical trust.

Although Trumley and Kubik apparently had some type of oral business arrangement, the exact nature of this arrangement is unknown. Trumley has not presented any evidence that the business relationship between him and Kubik was a joint venture as defined by Michigan law and, in fact, very little evidence regarding *any* aspect of this oral agreement was presented to the Court.[4] Even if Trumley had shown the existence of a joint venture as defined under state law, Sixth Circuit law requires an express or technical trust in order for a fiduciary duty to arise between parties for purposes of 11 U.S.C. § 523(a)(4). Trumley has neither alleged, nor presented any evidence, that the parties had an express or technical trust agreement. For this reason, this Court finds that the elements of § 523(a)(4) have not been met. Accordingly, this Court grants Kubik's motion for summary judgment with respect to this count, and Trumley's claim under § 523(a)(4) is dismissed.

---

      b.  Failing to compensate Tron for products sold in accordance with the Joint Venture agreement, and;

      c.  Depositing funds received on the sale of products into personal, non-business accounts and utilizing such funds for personal use.

[4] Trumley's conduct seems to contradict his allegations concerning the existence of a joint venture. With the assistance of law enforcement, Trumley entered onto Kubik's premises and seized the Freedom Fabworks logo fabricated parts, claiming they belonged to him. If a separate legal entity -- the joint venture -- existed, those parts would likely belong to it and not Trumley individually. Because the Court finds no express or technical trust, the Court does not need to address Trumley's conduct with respect to the parts.

### 3.   11 U.S.C. § 523(a)(6):   Nondischargeability Based On Willful and Malicious Conduct

Trumley alleges that Kubik's debt to him is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).  That section provides:

> (a)  A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Because the word "willful" modifies the word "injury," "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). A willful injury results when the actor either desires to cause the consequences of his actions or "believes that the consequences are substantially certain to result" from his actions.  *MarketGraphics Research Group, Inc. v. Berge (In re Berge)*, 953 F.3d 907, 915 (6th Cir. 2020) citing *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999) (internal quotation marks omitted).  A debtor "must will or desire harm, or believe injury is substantially to occur as a result of his behavior."  *Id.* at 465, n. 10.  A person has acted "maliciously" when that person acts "in conscious disregard of his duties or without just cause or excuse."  *Gonzalez v. Moffitt (In re Moffitt),* 252 B.R. 916, 923 (6th Cir. BAP 2000); *Murray v. Wilcox (In re Wilcox)*, 229 B.R. 411, 419 (Bankr. N.D. Ohio 1998).  There is no requirement that the person act with ill will, spite or animosity toward the injured party.  *Grange Mut. Cas. Co. v. Chapman (In re Chapman)*, 228 B.R. 899, 909 (Bankr. N.D. Ohio 1998).  With respect to section 523(a)(6), the creditor must prove each element by a preponderance of the evidence. *Rembert,* 141 F.3d at 281.

Trumley alleges non-dischargeability under §523(a)(6) in paragraph 76 of his Complaint.

Trumley's Complaint sets forth the alleged facts surrounding the "Jeep TJ Failure" in paragraphs

36 through 42:

> 36. In or about the Summer of 2018, Trumley, being understandably frustrated, informed G. Kubik that all repairs and modifications to the Jeep needed to be complete for a family off-roading trip in October or November of 2018.

> 37. G. Kubik represented that all repairs and modifications would be completed.

> 38. Trumley picked-up the Jeep TJ from G. Kubik upon the representation that certain of the pre-paid repairs and modifications had been made. The Jeep TJ was not, however, complete and Trumley was required to hire third parties to complete work that G. Kubik and/or Fabworks had been pre-paid to perform.

> 39. Upon inspection by other licensed mechanics, numerous problems were discovered, including: Failure to install new gaskets and sensors; Failure to properly tighten engine bolts and; Failure to install the transfer case plug.

> 40. Following correction of defects discovered and third-party mechanics getting the Jeep TJ running, Trumley spoke with G. Kubik, who represented that, with the third-party repairs, and despite the incomplete nature of certain cosmetic modifications, the Jeep TJ should be safe to drive, both on and off-road.

> 41. Based upon these representations, Trumley took the Jeep TJ and his family on a vacation to the Mohave Desert to off-road with the Jeep TJ.

> 42. Upon driving the Jeep TJ, things began to fail, endangering the lives of Trumley and his family in the remote desert. Failures included a catastrophic failure of the axel and suspension system as a result of the failure to properly install, tighten and set bolts. . .

The allegations in the Complaint, specifically paragraph 40, were subsequently

recanted by Trumley in his Declaration, in which Trumley specified:

> Following correction of defects discovered and third-party mechanics getting the Jeep TJ running, Trumley spoke with Mr. Kubik, who gave no indication that, with the third-party repairs, and despite the incomplete nature of certain cosmetic modifications, the Jeep TJ would be unsafe to drive. [Trumley Declaration, ¶¶ 29 – 32.] Rather, Mr. Kubik wished Mr. Trumley well and told him to have a good time. [Trumley Declaration, ¶ 32]

There is a significant difference between the wording in the Complaint ¶ 40 and Trumley's Declaration ¶¶ 29-32. Paragraph 40 alleges that Kubik made an affirmative representation that the Jeep TJ was safe to drive. Trumley later disavowed this assertion in his Declaration stating instead that, rather than telling Trumley the Jeep was safe to drive, Kubik failed to indicate that the Jeep TJ was unsafe to drive. In this case, this type of non-assertion does not rise to the level of willful and malicious.

Also, Trumley admitted that Kubik had not seen the Jeep TJ after Trumley took it to Steve Dexter and Alpha Fab for repairs in August 2018. [Trumley deposition, pp. 21-27]. In other words, at the time Trumley took his trip to the desert, Kubik did not have an opportunity to give the Jeep TJ a "once over" and he had not seen the Jeep TJ in almost three months. [Trumley deposition, p. 40]

Taken in a light most favorable to Trumley, these facts cannot support a finding of willful and malicious injury. In order for a defendant's behavior to be willful, the defendant must will or desire harm, or believe injury is substantially likely to occur as a result of his behavior. Here, there is no evidence that Kubik wished the Trumley any harm or that he believed that his work on the Jeep would result in Trumley's harm. In order for a defendant's behavior to be malicious, the defendant's behavior must be "in conscious disregard of one's duties or without just cause or excuse." There is nothing in the record that suggests that Kubik acted with malice. Indeed, Kubik referred Trumley to another mechanic to perform work Kubik felt he could not properly perform. Accordingly, this Court grants Kubik's motion for summary judgment with respect to § 523(a)(6), and Trumley's claim under 11 U.S.C. § 523(a)(6) is dismissed.

**B. Standards for Objections to the General Discharge Under § 727(a)**

Section 727(a) of the Bankruptcy Code allows for a debtor to obtain a discharge of all of his debts so long as his actions in filing bankruptcy demonstrate his good faith. Indicia of bad faith are set forth in § 727(a), and a debtor is entitled to a general discharge unless one or more of the eight conditions found there are met. Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor, consistent with the "fresh start" policy underlying the bankruptcy code. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996). However, courts recognize that "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Id.*; *Wazeter v. Michigan Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 226 (W.D. Mich. 1997).

The burden of proof under § 727 is on the party objecting to discharge. "This burden will shift to the debtor if the party objecting to the discharge puts forth sufficient evidence to establish a *prima facie* case. Thereafter, the debtor must present evidence to rebut the objecting party's claim. Nevertheless, it is always the party objecting to the discharge who bears the ultimate burden of persuasion, to prove by a preponderance of the evidence that all the statutorily required elements have been met." *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 156 (Bankr. N.D. Ohio, 1998) *citing Barclays/American Business Credit, Inc. v. Adams*, 31 F.3d 389, 393-94 (6th Cir. 1994).

In this case, Trumley specifically seeks denial of Kubik's discharge under §§ 727(a)(3) and 727(a)(4)(A).

**1. Section 727(a)(3): Failure to Keep or Preserve Records (Count IV)**

A debtor may be denied a discharge for failure to keep adequate financial records under section 727(a)(3) if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and

> papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).  This section requires debtors to produce records "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial accuracy for a reasonable period past to present."  *In re Wazeter*, 209 B.R. 222, 229,  *citing Juzwiak*, 89 F.3d at 427.

In order to prevail on a § 727(a)(3) action, the creditor must establish: (1) that the debtor failed to keep or preserve books or records; and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 724 (Bankr. E.D. Mich. 2003) *citing Beneficial Mortgage Co. v. Craig (In re Craig)*, 140 B.R. 454, 458 (Bankr. N.D. Ohio 1992). The creditor has the burden of proving the inadequacy of the debtor's records. *Id.*;  *CM Temporary Services, Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 415 (Bankr. S.D. Ohio 2007) *citing Grange Mut. Ins. Co. v. Benningfield (In re Benningfield)*, 109 B.R. 291, 293 (Bankr. S.D. Ohio 1989). A debtor may be denied his discharge for failure to maintain adequate records even if the debtor lacked the intent to conceal financial information. *Cutler*, 291 B.R. at 724 *citing American Motors Leasing Corp. v. Morando (In re Morando)*, 116 B.R. 14 (Bankr. D. Mass. 1990); *Reynolds v. Miller (In re Miller)*, 97 B.R. 760, 763 (Bankr. W.D.N.Y. 1989).  The adequacy of the debtor's records must be established on a case by case basis. *United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr. N.D. Ohio 1990). "Considerations to make this determination include debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice."  *Trogdon*, 111 B.R. at 658.  The ultimate burden of persuasion, as always, rests with the creditor.  *Bailey*, 375 B.R. at 416.

In the instant case, Trumley alleges that Kubik did not keep good records with respect to (i) the work he performed on Trumley's Jeeps, (ii) the parts provided to him for installation on the Jeeps, and (iii) the parts Trumley provided to Kubik under their oral business arrangement. [Complaint 46, 47]. In Count IV of the Complaint, Trumley alleges:

> 79. The Debtor operated Fabworks, seeking to shield himself and A. Kubik from personal liability while at the same time using funds of this businesses [sic] for personal purposes.

> 80. The Debtor, in his operation of Fabworks, concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained.

[Complaint 79, 80]. For this reason, Trumley argues that Kubik should be denied his discharge.

This Court finds that Trumley has failed to establish all of the elements required for a cause of action under § 727(a)(3). While it is undisputed that Defendant failed to keep or preserve some books or records, Plaintiff has not shown that such failure made it impossible to ascertain Kubik's financial condition and material business transactions. See, *In re Wazeter*, 209 B.R. at 222 (although it was undisputed that substantial and significant categories of information were not provided by debtor, objector failed to establish a *prima facie* case that records provided were inadequate to determine debtor's financial condition). Kubik ran a very small business and he testified that he relied on his bank statements to determine the financial status of his business and for tax information. This was not unreasonable under these circumstances. Moreover, Trumley could ascertain Kubik's financial position from a review of his bank statements and from an inventory of parts that Kubik returned to him. Therefore, the lack of records did not preclude Trumley from ascertaining Kubik's true financial condition. In addition, this Court finds no evidence that Kubik was attempting to conceal his assets or financial dealings from Trumley. Instead, the record, at worst, shows sloppiness in record keeping. For these reasons, the Court

grants Kubik's motion for summary judgment with respect to Trumley's 11 U.S.C. § 727(a)(3) claim, and Trumley's claim under §727(a)(3) is dismissed.

### 2. § 727(a)(4)(A): false oath or account

In accordance with 11 U.S.C. § 727(a)(4), the debtor shall be granted a discharge, unless:

(4) the debtor knowingly and fraudulently, in or in connection with the case –

(A) made a false oath or account;

"A false oath that is a sufficient ground for denying a discharge may consist of (1) a false statement or omission in the debtor's schedules or (2) a false statement by the debtor at an examination during the course of the proceedings." 6 *Collier on Bankruptcy* ¶ 727.04[1][c] at 727.42. In order to prevail under § 727(a)(4)(A), a creditor must establish five elements: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew that the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *Day v. Zwirn (In re Zwirn)*, 2005 WL 1978510 (Bankr. S.D. Fla. 2005) (citations omitted).

The purpose of § 727(a)(4)(A) is to "ensure 'that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.'" *Posillico v. Bratcher (In re Bratcher)*, 289 B.R. 205, 218 (Bankr. M.D. Fla. 2003) ( *quoting Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987)). Section 727(a)(4)(A) ensures that adequate information is available to the case trustee and creditors without the need for examination or investigation to determine whether the information is true. *United States v. Craig (In re Craig)*, 252 B.R. 822, 828-29 (Bankr. S.D. Fla. 2000). Debtors have a "paramount duty to consider all questions posed on a statement or schedule carefully and see that the question is answered completely in all respects." *Craig*, 252 B.R. at 829 (internal quotation omitted). "Policy

considerations mandate that the requirement to list all assets and liabilities is an absolute obligation of those seeking discharge of their debts." *Heidkamp v. Whitehead (In re Whitehead),* 278 B.R. 589, 594 (Bankr. M.D. Fl. 2002). "[A] debtor who fails to make a full and complete disclosure of relevant information places the right to the discharge in serious jeopardy." *Id.* A debtor's intent may be inferred from the facts:

> 'A reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of fraudulent intent necessary to bar a discharge.' However, a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent.

6 *Collier on Bankruptcy* ¶ 727.04[1][a] at 727-40-41.

In this case, Trumley alleges that Kubik both understated his income on his Statement of Financial Affairs and failed to list all of the businesses in which he held an interest. [Complaint, 84, 85]. In his brief, Trumley also argues that Kubik improperly depreciated his home shop on his tax return and that Kubik failed to disclose his "Road Rat" Jeep on his bankruptcy schedules.

With respect to the allegations in the Complaint that Kubik understated his businesses and failed to list all of his business interests, Trumley has not provided *any* evidence in support of these allegations. Trumley has not identified *any* specific business or business interests Kubik failed to disclose or the value of those interests. Consequently, Trumley has not established his *prima facie* case for a claim under § 723(a)(4)(A).

With respect to the improper depreciation of his home shop on his tax return and his failure to disclose his "Road Rat" Jeep, this Court finds that these alleged non-disclosures are not properly before the Court because Trumley's Complaint did not allege these instances. However, even had Trumley alleged that Kubik improperly depreciated his home shop on his tax return, the deposition testimony does not reveal any intent to deceive, especially in light of the fact that Kubik hired an accountant to help him prepare his tax returns and he presumably relied on that professional's

advice. With respect to the "Road Rat," in light of the informal way Kubik conducted his business and considering the unrefuted testimony which evidences confusion as to the ownership and value of the "Road Rat," this Court finds that Kubik's failure to schedule the "Road Rat" resulted from ignorance or carelessness and not from an intent to deceive or withhold assets from creditors. For these reasons, this Court grants Kubik's motion for summary judgment with respect to Trumley's claim under § 727(a)(4)(A) and dismisses this count of Trumley's Complaint.

V.

<u>CONCLUSION</u>

For the above stated reasons, this Court GRANTS Defendant Kubik's motion for summary judgment with respect to all counts of Plaintiff Trumley's Complaint. Accordingly, Trumley's Complaint is dismissed.

**Not for publication**

**Signed on August 27, 2020**



/s/ **Joel D. Applebaum**

**Joel D. Applebaum**
**United States Bankruptcy Judge**